HERBERT A. CADE, Judge Pro Tern.
Scott Lingle asks this Court to reverse his conviction for the second degree murder of Janet McLeod claiming irrelevant “other crimes evidence” and prejudicial hearsay were admitted in the proceedings below. We find no reversible error; we affirm.
Janet McLeod was sixty-two years old when she was murdered. For a number of years she had been employed by Helen Russel as a live-in housekeeper, primarily to care for Mrs. Russel’s ninety-eight year old mother, Mrs. Emma Schexnayder. She rarely left the Russel household and did not admit strangers. Lingle, then fifteen years old, knew the victim, knew the victim’s employer, and knew the victim’s charge. He often called to visit.
Shortly before 3:00 p.m. on March 13, 1982, Helen Russel left her mother and Janet McLeod at home for a hospital appointment. Between 5:05 and 5:10 p.m. Mrs. Russel and the victim spoke on the telephone. Lingle was driven by a friend from his grandmother’s residence to the Russel residence, arriving at 5:16 p.m. He remarked to his friend that the visit was “a good opportunity to steal something.”
Lingle’s grandmother, Philomene Cu-sachs, telephoned Janet McLeod soon after the call from Helen Russel. Mrs. Cusachs testified at trial:
She interrupted the conversation, it was a brief call ... and she informed me that she would have to hang up because someone was at the door.
Helen Russel returned home just after 6:00 p.m. to find the outer iron security back door open and the wooden inner door unlocked; in the den she found Janet McLeod lying in a pool of blood. Mrs. Russel immediately went from the den to her mother's bed. At trial she testified:
So, I went diagonally across the room to get to my mother ... I didn’t know whether she was alright ... When I got *173 into the room I said “Momma, what seems to be the trouble?” ...
Over objection, Helen Russel continued to testify:
She said, “Janet was in here folding clothes, towels,” and she said somebody pound ... was pounding on the back door, and I told Janet, “don’t go ... don’t go cause Helen has the key and she can get in.” She said, “she went anyway,” and she said, “she’s never come back,” and she says, “I am hungry, I have never had anything to eat.” So, I said, “well momma,” I said, “Janet’s sick.” She said, “what’s wrong with her?” I said, “I don’t know, I am going to go call the doctor,” but instead I called the police.
Investigation showed numerous stab wounds inflicted with various instruments to Janet McLeod’s head, face, neck, chest, back and her genital area. Her face was bruised and swollen. Facial bones were broken, her skull was crushed, and her head bore prints of a tennis shoe. Imbedded in her skull was the broken point of a pair of scissors. Death was caused by slashes to her throat. Bloody footprints led from the victim through the back door to a vacant lot across the street, where investigators found the scissors and a hatchet buried in a pile of sand.
Lingle met a second friend between 6:30 and 6:45 that evening, whom he offered pills from bottles bearing Helen Russel’s name. He went with a third friend to a party an hour later. This friend testified that that evening Lingle related the circumstances of Janet McLeod’s murder, without mentioning his presence at the scene:
Scott ... said that he had just spoken with his grandmother and his grandmother had told him that Janet McLeod had been killed in — at Miss Helen’s house, and that she was stabbed numerous times and that she was also stabbed in the vagina.
Lingle’s grandmother testified she was not then informed of and had not described the nature of the victim’s injuries to Lingle.
When confronted the next day by his companions of the night before about his presence at the murder scene, Lingle claimed he had knocked at the door but left when no one answered. Later Lingle admitted he had gone inside. He claimed to have knocked at the back door, then at a patio door, discovered the patio door unlocked, entered, and found Janet McLeod already murdered. He joked he had killed her:
... Scott said “yes ... I did it, I snuck up from behind, chopped her in the back of the head with an axe thirty, forty, or fifty times, then I stabbed her in the pussy.”
Lingle was subsequently arrested. A search warrant was obtained and a quantity of roniacol and darvocet pills was found in his bedroom closet. Analysis of his socks revealed blood of the victim’s blood type. Analysis of his shoes revealed that they had been washed recently and showed traces of blood. His shoe prints matched the impressions on the victim’s head for design, design size, and general wear characteristics. Comparison of individual wear characteristics was inconclusive. A blood-soaked piece of paper found next to the victim, when analyzed, revealed the words “seconal”, “valium”, “methaqualude”, and “placidyl”, in Lingle’s handwriting.
Lingle testified to the jury and now argues to this Court that he merely discovered and approached the body and flipped it with his foot, but did not commit the crime. He postulates that Janet McLeod admitted her assailant through the front door, that she was initially attacked in a front room adjoining the den with a candy dish, a broken piece of which was found in the front room, and that she was moved to the den where she was killed. Lingle maintains he ran frightened and horrified from the house and that it did not at first occur to him to report what he had seen. He claims he did not report the crime when it subsequently occurred to him to do so because he feared recrimination for his failure to report it earlier. He claims he found the roniacol and darvocet in the trash at a pharmacy where he worked. Admitting that the handwritten list of drugs is his, Lingle claims he had agreed to supply a *174 classmate those drugs as he found them in the trash. Lingle’s employer testified the pharmacy never discarded the type of drugs found in Lingle’s home or on his list.
On the facts established, the trial judge plainly did not abuse his discretion in finding the roniacol and darvocet pills relevant within the meaning of R.S. 15:441; Lingle’s possession of these pills makes facts indicating guilt more probable. See State v. Whittaker, 46S So.2d 1270, 1272 (La.1985); State v. Lopez, 484 So.2d 217, 224 (La.App. 4th Cir.1986). In our view, connexity between this evidence, defendant and the crime is established by a preponderance of the evidence, if not beyond a reasonable doubt. See State v. Whittaker, 463 So.2d at 1272-73, citing State v. Rittiner, 341 So.2d 307 (La.1976); State v. Singleton, 311 So.2d 881 (La.1975). This evience was properly admitted.
We incline to agree, on the other hand, that reference in Helen Russel’s hearsay testimony to a “pounding on the back door” should not have been allowed.[1] Contrary to the state’s position at trial and to the trial court’s ruling, Mrs. Schexnayder’s statement to Helen Russel does not fit within the excited utterance exception to the hearsay rule. She was completely unaware of the murder; her response to her daughter’s question is rather a result of reflective thought than a spontaneous reaction to an occurrence or event. See State v. Henderson, 362 So.2d 1358, 1362 (La.1978); and see State v. Smith, 285 So.2d 240, 244 (La.1973). Contrary to the state’s position in this court, justification for admission of this statement is not found in its non-assertive value. That reference to the back door was made by Mrs. Schexnayder is of no importance except for the truth of the matter asserted. See State v. Green, 282 So.2d 461, 464 (La.1973), cert. denied 415 U.S. 985, 94 S.Ct. 1580, 39 L.Ed.2d 882 (1974); State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). And although this testimony is otherwise cumulative, Mrs. Schexnayder’s statement is the only evidence put before the jury to suggest directly that Janet McLeod admitted her assailant through the back door.
We cannot agree, however, that admission of this statement is in any way prejudicial. Assuming contradiction of Lin-gle’s hypothesis of innocence, a tenuous assumption because entry through the front door is not antecedent to Lingle’s suggested sequence of attack, his explanation of the murder, standing alone, is incredible. Standing refuted at every other turn, his is not a reasonable hypothesis of innocence, regardless of Helen Russel’s testimony. The evidence, direct and circumstantial, leaves no doubt of Lingle’s commission of the murder and renders admission of the hearsay harmless.
The conviction is affirmed.

. On the transcript it is unclear whether this testimony constitutes simple hearsay or hearsay within hearsay. We need not resolve the question. In the latter event each statement must come within the hearsay exception for the testimony to be admissible. We hold that Mrs. Schexnayder’s does not.